Filed 7/25/14  American Diversified Properties v. RE/EX Valencia CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| AMERICAN DIVERSIFIED PROPERTIES, INC., | B246501 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC360128) |
| v. | |
| RE/EX VALENCIA, INC., et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment and orders of the Superior Court of Los Angeles County, Steven J. Kleifield, Judge.  Affirmed.

Norminton, Wiita & Fuster, Thomas M. Norminton and Kathleen Dority Fuster for Plaintiff and Appellant.

Gaines & Stacey, Lisa A. Weinberg and Alicia B. Bartley for Defendants and Respondents RE/EX Valencia, Inc., and Sara Fincher-Schmidt.

Spile, Leff & Goor and Andrew L. Leff for Defendant and Respondent Valleywide Escrow, Inc.

June Babiracki Barlow and Neil Kalin for California Association of Realtors as Amicus Curiae on behalf of Defendants and Respondents.

\* \* \* \* \* \*

This action involves a commission dispute between real estate brokers, plaintiff American Diversified Properties, Inc. (ADP), and defendants RE/EX Valencia, Inc., doing business as Realty Executives, Inc. (Realty Executives), and Sara Fincher-Schmidt (Schmidt). ADP also sued the escrow holder in the transaction, Valleywide Escrow, Inc. (Valleywide).[1] ADP appeals from the judgment in favor of the defendants and from attorney fees and costs orders.[2] We affirm the judgment and orders.

## FACTS AND PROCEDURE

### 1. ADP's Theory of the Case

ADP's operative second amended complaint (complaint) alleged the following facts. The Campbell Family Trust engaged Realty Executives as brokers to sell approximately 9.49 acres of vacant land in Santa Clarita, California. The seller agreed to pay Realty Executives a percentage of the purchase price as consideration for its broker services. Bradley Business Center, a general partnership comprised in part of Kerry Seidenglanz and Mark Seidenglanz,[3] was interested in buying the property. Bradley Business Center engaged ADP as its broker.

On or about March 15, 2006, ADP and Realty Executives entered into a partly oral, partly written agreement. The brokers orally agreed to split 50-50 the commission

---

[1] We have filed two prior nonpublished opinions in this case, *American Diversified Properties, Inc. v. Valleywide Escrow, Inc.* (Sept. 3, 2008, B197816) (*ADP I*) and *American Diversified Properties, Inc. v. Realty Executives, Inc.* (June 7, 2011, B222560) (*ADP II*). In *ADP I*, we reversed an order sustaining Valleywide's demurrer to the original complaint without leave to amend and held ADP could cure the defects in the original complaint with suitable amendments. In *ADP II*, we reversed the trial court's grant of summary judgment in favor of Realty Executives and Schmidt, holding there were triable issues of material fact.

[2] We consolidated ADP's appeal from the judgment with its appeal from the attorney fees and costs orders.

[3] For the sake of clarity, we will refer to members of the Seidenglanz family by their first names. We will also refer to Schmidt's husband, Stephen Schmidt, by his first name for the sake of clarity. We do not intend this informality to reflect a lack of respect.

2

offered by the seller. The written portion of the brokers' agreement was found in the purchase agreement for the property. Bradley Business Center and the Campbell Family Trust entered into the purchase agreement on or about May 19, 2006. The purchase agreement acknowledged ADP and Realty Executives as the respective brokers for the buyer and seller and made the brokers third party beneficiaries of the purchase agreement and escrow instructions. The purchase agreement identified Valleywide as the escrow holder.

The first cause of action alleged breach of oral contract against Realty Executives because it failed to split the commission with ADP and instead took the entire commission for itself. Based on these same facts, the second and third causes of action alleged common counts for "reasonable value of services provided" (quantum meruit) and money had and received against Realty Executives and its agent, Schmidt. (Boldface and capitalization omitted.) The fourth, fifth, and 10th causes of action alleged breach of contract, breach of fiduciary duty, and negligence against Valleywide for disbursing the full commission to Realty Executives, despite having notice of the commission dispute between the brokers and despite receiving instructions from ADP to hold the commission. The sixth and seventh causes of action alleged intentional and negligent interference with contract against Realty Executives and Schmidt for persuading Valleywide to disburse the disputed commission, thereby causing Valleywide to breach its contractual obligations to ADP. The eighth and ninth causes of action against Schmidt alleged intentional and negligent interference with contract for persuading Realty Executives to take the entire commission in breach of the brokers' commission-sharing agreement.

The parties tried the case to the court over the course of 13 days.

## 2. Trial Evidence

### a. Buyers' Offer and the Purchase Agreement

Schmidt is a real estate salesperson who worked at Realty Executives, a real estate brokerage firm. She has closed 25 to 30 deals while working with cooperating brokers. Schmidt represented the sellers of the subject property, the Campbell Family Trust.

3

Daniel Campbell (Campbell), the cotrustee of the Campbell Family Trust, refused to sign a listing agreement with Schmidt, which would have given her the exclusive right to list the property. He did not want the property listed on a multiple listing service (MLS) or want a "For Sale" sign on it because he did not want "people knowing his business."

Instead, Schmidt had a commission agreement with the Campbell Family Trust stating she would receive 7.5 percent of the selling price if she sold the property for at least $6.5 million. The commission agreement provided: "Broker may cooperate with other brokers, and divide with other brokers such compensation in any manner acceptable to Broker."

ADP is another real estate brokerage firm. Kerry is the president of ADP. Kerry and his brothers Mark and Chris Seidenglanz are the sole shareholders of ADP. Kerry and Mark were also brokers with ADP in 2006. Kerry and Mark are partners in Bradley Business Center, a general partnership, along with two other individuals. In 2006, Bradley Business Center engaged ADP to act as its broker in locating and acquiring a real estate investment. Kerry and Mark have personally brokered hundreds of transactions in their careers, though more of those transactions were leases and not sales of properties. In all but one transaction Kerry could remember, ADP split the commissions in these transactions 50-50 with the cooperating brokers. The agreements with the cooperating brokers to split commissions were "always made verbally," though the parties usually reduced these agreements to writing later on.

According to Kerry, whenever he inquires about a property, he always identifies himself as a broker as soon as he contacts the other side. When he saw an advertisement for a property brokered by Schmidt and Realty Executives, he called Schmidt to inquire about the property and immediately told her he was a broker with ADP. Kerry is absolutely certain he identified himself as a broker in that first call with Schmidt.

Schmidt does not recall Kerry identifying himself as a broker in that first call. He introduced himself by name but did not mention a company affiliation. She asked him whether he was a buyer or broker. He said he was a buyer and said nothing about being a broker. She was certain she asked him whether he was a buyer or broker because she had

4

different scripts she had practiced and used depending on whether the inquiry came from a buyer or broker. Kerry inquired about one of Schmidt's properties, but when they determined it was not suitable for his purposes, Schmidt told him about the Campbell Family Trust property. If she had known he was a broker, she would not have given him all the information about the property before meeting with him and knowing more about him because she did not have an exclusive listing agreement with Campbell.

After that initial call, Kerry and Mark met with Schmidt at the Realty Executives office on or about March 14, 2006. It was at this meeting that ADP contends the parties reached the oral commission-sharing agreement. Kerry and Schmidt exchanged business cards. Kerry's cards said ADP on them. According to Kerry, he told Schmidt he and Mark were partners in Bradley Business Center and also brokers with ADP. Additionally, he told her if ADP produced a buyer for the property, he would expect to split the commission 50-50. Schmidt said "she had some costs and expenses that she had already put into the property and she would want to recoup those." Kerry testified that, in response, "Mark looked at me, and I looked at him, and Mark said, that can only be 2-, 3-, $4,000, not a big deal. He said fine. [¶] I looked back at [Schmidt] and said fine, and Mark said fine." Schmidt did not say anything or make any gestures or movements after they said "fine." She went on to describe the property. Kerry interrupted her presentation to ask how much her commission was. She did not respond and continued with her presentation, and Kerry did not interrupt her again.

Schmidt recalls the meeting differently. According to her, Mark did not have a business card with him, and when she saw Kerry's business card, she assumed ADP was his employer, but she did not know ADP was a brokerage firm, and she did not know he was acting as a broker or an agent of ADP. His card did not say he was a broker or have a real estate license number on it. Kerry and Mark did not introduce themselves as brokers at this meeting or say they were affiliated with any company. Kerry did not say anything about ADP or Bradley Business Center. When she was talking to them, she believed they were buyers because (1) that is what Kerry told her in their initial call, and (2) they were asking questions about the property that, in her experience, a developer

5

would ask. They never referred to their "clients," and they used the pronouns "I" or "we."

At some point, Kerry interrupted her presentation to ask, "what's the commission on this, 2, 2-½ percent[?]" The question surprised Schmidt because she believed he was merely the buyer, and it was unusual for a buyer to ask how much the commission was in a transaction. Schmidt then told them she had been working on the property for a long time and had costs she needed to recoup. She did not intend to convey a request to Kerry and Mark that they allow her to recoup costs. She did not know how to respond because she was taken aback by the question. Her response was essentially an attempt to deflect. She wanted to ignore the question about commission and move on.

If they had said anything about being brokers and expecting half of the total commission or any commission at all, Schmidt would have told them immediately she was not offering half. She would have remembered if they had asked for a commission, but they did not. Nor did she offer any commission. After the meeting, they asked Schmidt to type a letter of interest for them. This confirmed her belief they were buyers but not brokers because typically buyers would ask their brokers to do something like this for them.

Kerry and Mark met with Schmidt again to present an offer on the property. The offer was printed on a standard form of the American Industrial Real Estate Association. They spent at least an hour and a half going through the offer paragraph by paragraph. Schmidt insisted on using Valleywide as the escrow holder. The offer identified the buyers as Mark, Kerry, Bradley Business Center, and/or an assignee. It identified ADP as the buyers' broker and Gloria Seidenglanz at ADP. Gloria was not actually involved in the transaction, and she and Schmidt had never spoken. Schmidt was confused by the inclusion of her name and asked about Gloria. Kerry said she was his mother.

An addendum to the offer disclosed that "[s]ome of the buyers are principals in [ADP] and hold valid California real estate licenses." Schmidt never asked which of the buyers held real estate licenses.

The offer contained a paragraph relating to broker commissions. It stated:

6

"*Brokerage Fee*. Payment at the Closing of such brokerage fee as is specified in this Agreement or later written instructions to Escrow Holder executed by Seller and Brokers ("Brokerage Fee"). It is agreed by the Parties and Escrow Holder that Brokers are a third party beneficiary of this Agreement insofar as the Brokerage Fee is concerned, and that no change shall be made with respect to the payment of the Brokerage Fee specified in this Agreement, without the written consent of the Brokers."

Schmidt did not say anything at the meeting about this paragraph.

Kerry and Mark presented the offer with a cover letter on ADP letterhead. The cover letter referred to "our Offer to Purchase" and "We, the buyers," and it stated "we will be the ultimate owner." Kerry's and Mark's signature lines simply stated their names and did not identify them as affiliated with any particular entity. They also presented the offer with a letter from their bank stating "[t]he Seidenglanz brothers maintain the financial wherewithal to close the real estate transaction under consideration in the amount of $6.5 million with their cash resources." Seeing these statements in the cover letter and bank letter further confirmed Schmidt's belief that Kerry and Mark were buyers and not brokers.

Campbell rejected the offer from Kerry and Mark. He did not feel he could sell the property at that point because he was involved in an arbitration with Edison regarding an easement on the property. He rejected the offer in March 2006. Kerry called Schmidt in April 2006 to see if the arbitration was still pending because he remained interested in the property.

Schmidt set up a meeting for May 5, 2006, between Schmidt, Kerry, Mark and Campbell. Kerry and Mark never identified themselves as brokers at this meeting. They told Campbell they were interested in purchasing the property, and they proceeded to discuss deal points. The parties interlineated Kerry and Mark's offer form. Campbell requested that a clean agreement be drawn up because the offer form contained many markups and crossed-out sections. Kerry and Mark said they were not good typists, and although Schmidt was not either, she offered to draw up the new purchase agreement in conjunction with her assistant.

7

Schmidt's draft was based on Kerry and Mark's offer form and her notes from the meeting with Campbell. Kerry met with Schmidt and her husband Stephen at her home to finish the purchase agreement when it was close to being complete. The meeting lasted approximately four hours. Schmidt introduced Stephen and told Kerry that Stephen was a broker. Stephen asked Kerry what he did for a living. Kerry said, "I put the deals together, and my brother builds them." He did not say he was a broker or that he worked for ADP. At the meeting, Schmidt and Stephen were typing portions of the agreement, and Kerry was reviewing the changes as they were generating them. Kerry made changes to the draft, but none of them related to the brokers or brokers' commission. Kerry said he did not make such changes because he thought they had an agreement on the commission already.

Kerry and Mark signed the purchase agreement as buyers on or about May 15, 2006. Paragraph 1.1 of the purchase agreement defined the buyers as Kerry, Mark, Bradley Business Center, "and/or assignee." (Capitalization omitted.) Paragraph 5.1 identified the brokers as follows:

"**Real Estate Brokers**

". . . The following real estate broker(s) ('**Brokers**') and brokerage relationships exist in this transaction and consented to [*sic*] by the parties: REALTY EXECUTIVES Stephen C. Schmidt and Sara Fincher represent Sellers exclusively ('**Sellers' Broker**') AMERICAN DIVERSIFIED PROPERTIES, INC. Represent Buyers exclusively ('**Buyers' Broker**') The Parties acknowledge that Brokers are the procuring cause of this Agreement." (*Sic*.)

Kerry did not request that he and Mark be added to this paragraph as agents of ADP because he felt "[i]t wasn't necessary. She [(Schmidt)] knew who we were." For her part, Schmidt said she did not know who was acting as the agents of ADP, other than perhaps Gloria because she was referenced in the offer, but Schmidt had never had contact with Gloria. Paragraph 5.3, carried over from Kerry and Mark's offer, stated some of the buyers were principals in ADP and held valid California real estate licenses.

Under the purchase agreement, Valleywide had to verify that all of the buyer's contingencies had been satisfied or waived prior to closing. Paragraph 7.1 of the

8

purchase agreement stated it was setting forth the contingencies that had to be satisfied or waived before closing the transaction. At the same time, paragraph 6.6 stated certain subparagraphs of 7.1, including subparagraph (k) (paragraph 7.1(k)), were "matters of agreement between the Parties only and are not instructions to Valleywide Escrow."

Paragraph 7.1(k) of the purchase agreement has been the subject of much dispute in this litigation. It states:

> "*Brokerage Fee*. Payment at the Closing of such brokerage fee as is specified in a separate Agreement executed by Listing Broker and Cooperating Broker provided to Valleywide Escrow. It is agreed by the Parties and Valleywide Escrow Holder that Brokers are a third party beneficiary of this Agreement insofar as the Brokerage Fee is concerned, and that no change shall be made with respect to the payment of the Brokerage Fee specified in this Agreement, without the written consent of Brokers."

While Schmidt based paragraph 7.1(k) on the similar paragraph in Mark and Kerry's offer form, she changed some of the language. The provision in the offer form did not identify Valleywide as the escrow holder, and it referred to "brokers" but not "listing broker" and "cooperating broker." Kerry believed paragraph 7.1(k) was there to protect the brokers and specify that there would be a separate agreement delineating how the commission would be split to instruct the escrow holder. Mark assumed Schmidt would send an instruction to the escrow holder identifying her costs and telling it to disburse the commission 50-50 after deducting those costs.

Kerry and Mark signed the purchase agreement under a line stating: "Buyer: Kerry Seidenglanz & Mark Seidenglanz, Bradley Business Center and Assignees." Neither Realty Executives nor ADP was a signatory to the purchase agreement.

Kerry traveled out of the country from the beginning of June 2006 to around July 4, 2006. During this time, Schmidt did not communicate with him or Mark. When he returned in July 2006, the dispute about the commission arose.

b. *Escrow and Closing of Transaction*

Cynthia Moller was the Valleywide escrow officer for this transaction. The purchase agreement was made part of the escrow instructions. Moller understood

Valleywide was required to disburse the funds from escrow in accordance with the terms of the purchase agreement. Moller read the agreement and understood it bound the escrow holder to follow applicable law and custom and practice in the industry. In particular, she read paragraph 7.1(k) when she received the purchase agreement. She understood when reading that paragraph that ADP was the "cooperating broker." She was not aware of any specific deadline for the brokers to provide Valleywide with the "separate Agreement" referenced in paragraph 7.1(k). She never received a separate agreement signed by both brokers regarding commission. She did, however, receive an irrevocable instruction from the seller in June 2006 directing Valleywide to pay a commission of 7.5 percent (or $487,500) to Realty Executives. Moller did not consider the content of paragraph 7.1(k) when she performed her duties in this transaction because paragraph 6.6 expressly stated paragraph 7.1(k) was a matter of agreement between the parties only and *not* instructions to Valleywide.

Schmidt expects a buyer's broker to present a request for commission by submitting a cooperating broker's agreement along with the buyer's offer. Kerry and Mark never did this. It first crossed Schmidt's mind that Kerry was a broker in July 2006 when Moller told her. Kerry had been asking Moller about the commission and indicated he was expecting one. Moller called Schmidt and asked if Realty Executives had offered him a commission. Schmidt responded that she did not even know Kerry and Mark were brokers.

Once Schmidt realized Kerry was a broker, she was willing to share some of the commission with ADP. She consulted her supervisors and an attorney about the situation because she was unsure what to do. She was willing to offer Kerry up to 2.5 percent, but she decided to start with an offer of 2 percent. Two and a half percent was the same amount she had offered other brokers in the past on this property. Additionally, when Kerry had asked about the commission, he had assumed 2 or 2.5 percent, so she thought this would be acceptable to him. She drafted a "cooperating broker compensation agreement" providing for ADP to receive a 2 percent commission and took this agreement to a lunch meeting with Kerry on or about July 28, 2006. She wanted this

10

agreement executed in writing so that they could give it to Valleywide, per paragraph 7.1(k). She did not know before July 28 that Kerry believed he was entitled to half of her commission. There had been no mention of commission between Schmidt, Kerry, and Mark since their meeting on March 14.

At the July 28 meeting, Kerry and Schmidt completed some escrow paperwork. Afterward, Schmidt told Kerry she wanted to offer him 2 percent of the purchase price as commission and presented the cooperating broker compensation agreement. According to Schmidt, Kerry rejected the offer and said he felt he was "entitled to" half of the total commission because he had fulfilled his obligations. He wanted to take the commission in the form of a reduction in the purchase price. He became very angry when she made her proposal and threw the cooperating broker agreement at her. He did not say they had previously agreed on a 50-50 commission split. Schmidt then offered him 2.5 percent of the purchase price, which he also rejected. She never intended to share half of the 7.5 percent commission with any cooperating broker. Even before she met Kerry and Mark, she had intended that Realty Executives would keep at least 5 percent of the purchase price as commission.

According to Kerry, when Schmidt offered ADP a 2 percent commission, she explained she felt she was entitled to more than the customary 50-50 split because she had been working on the property for over a year. Kerry was angry and said they had not agreed on an unequal split. He asked how much the commission was, and Schmidt said 5 percent. He told her he did not believe that. He asked to see the commission agreement with the seller, and she refused.

Kerry contacted Valleywide and Realty Executives to learn how much the total commission was, but no one would share that information. Moller refused to give him that information because the seller was paying the commission, it was part of the seller's side of the transaction, and she did not have the seller's consent to disclose the information. Kerry eventually learned the total commission was 7.5 percent of the purchase price. Realty Executives again offered him a 2.5 percent commission to try to resolve the dispute, and Kerry rejected it.

11

He wrote a letter proposing a 50-50 split of the commission, with ADP taking its portion of the commission by way of a purchase price reduction. Kerry said he had spoken to Campbell regarding the purchase price reduction, and he had agreed to this. But according to Schmidt, she asked Campbell about paying ADP in the form of a price reduction after the lunch meeting on July 28, and Campbell unequivocally rejected that possibility. Campbell also testified he told Kerry "absolutely not" in response to his proposal. Campbell did not understand why Kerry was trying to change the deal right before closing, and he would not agree to change the deal.

On or about August 11, 2006, ADP sent Moller a fax stating: "As you are aware there is a dispute between the Brokers regarding the commissions. You are hereby instructed to hold all commissions until this dispute is resolved." Kerry and Mark as buyers also sent a supplement to the escrow instructions. This document stated in pertinent part: "Buyer and seller hereby acknowledge that all contingencies to this transaction have been satisfied, and escrow holder is hereby instructed to proceed with the closing of this escrow. EXCEPT THAT Escrow Holder is to hold all commissions [and] compensation to be p[ai]d to any Brokers in [t]his [t]ransaction pursuant to the letter/instructions [f]axed to [y]ou on 8-4-06 by [ADP]." Kerry agreed to let the transaction close and deal with the commission dispute afterward. The transaction closed on or about August 14, 2006.

From March to August 2006, Kerry estimated he worked "hundreds" of hours to close the transaction. His work included "going through the preliminary title reports, going through easements, checking, meeting with the city, checking on the zoning, . . . finding out about negotiating about utilities, doing soils work," and meeting with the seller's attorney and Edison to bring about a settlement in the pending arbitration with Edison. He had ongoing communications with Schmidt about the work he was doing, and she encouraged it. Mark also put in "a lot of work" to get the transaction closed between March and August of 2006. It was the type of work he would have done as a broker for other clients, and he and Mark used ADP's resources to accomplish the work.

12

*c. Postclosing Commission Disbursement*

Valleywide eventually disbursed the entire 7.5 percent commission to Realty Executives after getting instructions from Realty Executives. Realty Executives initially instructed Valleywide to hold 2.5 percent of the purchase price in escrow pending further instructions, which Valleywide did. When ADP filed this action, Valleywide was still holding the 2.5 percent. Schmidt agreed to defend and indemnify Realty Executives for any liability and pay its attorney fees in this action. In return, Realty Executives agreed to release to her the remaining 2.5 percent of the commission. Realty Executives thus instructed Valleywide to disburse the 2.5 percent commission it was holding.

*d. Expert Witness Testimony*

i. ADP's Expert on Broker and Escrow Issues

ADP's expert, Alan Wallace, opined ADP was entitled to half the commission offered by the seller to Realty Executives, less Realty Executives' costs. Raw land deals were particularly difficult. It was custom and practice for the seller to offer a 10 percent commission to a broker for the sale of raw land such as this, and typically the seller's broker would have to offer at least half of that commission to the buyer's broker to entice the broker to bring in his client. If the seller's broker was not going to offer the customary half of the commission, he or she should tell the buyer's broker immediately. The purchase agreement identified ADP as the buyers' exclusive broker and as a "procuring cause" of the transaction, confirming that ADP was significant to the transaction and did a substantial amount of work to close it. Even if there was not an express agreement between ADP and Realty Executives to split the commission 50-50, Realty Executives was still obligated to share half because of the custom and practice.

Wallace acknowledged that in a standard transaction, the seller generally dictates who gets paid the commission. The seller generally is the party paying the commission, not the buyer.

Regarding escrow issues, Wallace opined Valleywide breached its duties as an escrow holder when it disbursed the entire commission to Realty Executives without the separate agreement of both brokers referenced in paragraph 7.1(k) of the purchase

13

agreement. He believed it also breached its duties by not holding the commission funds in escrow when instructed to do so by the buyer and the buyers' broker. Paragraph 7.1(k) made the brokers third party beneficiaries of the agreement and told Valleywide that when it came to commission, it needed the consent of both brokers to change the commission, and both brokers could instruct Valleywide relating to commission. When ADP sent instructions to Valleywide to hold the commission pending resolution of the dispute between it and Realty Executives, Valleywide was required to follow the instruction. Anytime an escrow holder gets conflicting instructions, the custom and practice is for it to not act until a resolution can be reached or a court order directs it to act.

ii. Realty Executives and Schmidt's Expert on Broker Issues

Realty Executives and Schmidt's expert on broker issues, John Pagliassotti, opined that even though it is common in the commercial real estate industry to share a commission 50-50, it is not absolute custom, and the brokers always need to agree upon the split, which may be less than 50-50. None of the ethical rules and regulations applicable to real estate brokers requires sellers' brokers to share their commission 50-50 with buyers' brokers. For example, the National Association of Realtors (NAR) Code of Ethics and Standards of Practice states the obligation to cooperate between brokers "does not include the obligation to share commissions, fees, or to otherwise compensate another broker." In addition, the same code states sellers' brokers establish the terms and conditions of offers to cooperate, and unless expressly indicated in the offer to cooperate, cooperating brokers cannot assume an offer of cooperation includes an offer of compensation. Cooperating brokers, moreover, shall ascertain the terms of compensation "before beginning efforts to accept the offer of cooperation." The rules of the Society of Industry and Office Realtors (SIOR) also state these principles.

Pagliassotti knew of many transactions when either the commission offered by the seller was not split 50-50 between the brokers or it was not split because the buyer compensated the buyer's broker. In his own experience with similar properties, he had represented the buyers in five vacant land transactions, and in all of those instances, the

14

buyer paid his commission, not the seller or the seller's broker. Thus, the seller's broker did not share its commission at all. Pagliassotti did not agree with Wallace that raw land deals were particularly difficult or that sellers' brokers typically had to offer half of the commission to buyers' brokers to entice them to bring in buyers.

Pagliassotti explained there is customarily an exclusive listing agreement between the seller and the seller's broker, and such an agreement would require the seller to pay a commission to its broker. The commission agreement between Campbell and Realty Executives differed because it did not give Schmidt and Realty Executives the exclusive right to a commission if the property sold and did not protect her if a buyer's broker went around her to negotiate directly with Campbell. A listing agreement would also require the listing broker to market the property to the public on an MLS and by other means. When a property is listed on an MLS, the amount of the commission being offered to a cooperating broker is required to be listed. Schmidt and Realty Executives did not make such an offer here because the property was not listed on an MLS.

Pagliassotti also opined ADP was "incompetent" in its pursuit of this commission. It was customary that the brokers confirm commissions in writing, particularly on a transaction of this size. According to relevant ethical rules, the terms of compensation for cooperating brokers should be in writing. Schmidt protected her right to a commission by having a written commission agreement with Campbell. It was incumbent on ADP to procure a written acknowledgement of any agreement by Realty Executives to share the commission. There were numerous instances when ADP could have procured such a writing, including the meetings with Schmidt, the meeting with Campbell, its original offer, and the purchase agreement.

iii. Valleywide's Expert on Escrow Issues

Valleywide's expert on escrow issues, Lore Hilburg, opined Moller handled the escrow at all times competently and consistent with the custom and practice in the Southern California industry. When performing her duties, Moller was not to be concerned with paragraph 7.1(k) of the purchase agreement because the agreement expressly told her elsewhere that paragraph 7.1(k) was not an instruction to Valleywide.

15

The buyer and seller are parties to the escrow, but the brokers are not. As such, brokers can instruct the escrow officer on behalf of their clients, but they cannot instruct the escrow officer on behalf of themselves. Hilburg opined that here, Valleywide did not receive any conflicting instructions regarding commission. It had only one instruction on this topic, the irrevocable instruction from the seller to pay Realty Executives a 7.5 percent commission. The commission was coming from the seller's proceeds, not the buyer's funds, and accordingly, the seller had the right to direct payment. Once Valleywide received the irrevocable instruction to pay Realty Executives, Valleywide could take instruction from Realty Executives as to how it wanted the commission disbursed.

The letters or purported instructions from Kerry regarding commission had no impact on Valleywide's duties because only the seller had a right to direct how to pay the commission offered by the seller. If Valleywide received an executed agreement between Realty Executives and ADP showing some of Realty Executive's commission should be paid to ADP, Valleywide would have paid ADP. But it did not receive any documentation showing Realty Executives had agreed to this.

### 3. Trial Court's Statement of Decision

The court found ADP failed to prove all causes of action in the complaint. Schmidt had filed a cross-complaint against ADP for intentional and negligent interference with contract. The court also found Schmidt did not prove the causes of action in her cross-complaint. Because Schmidt has not appealed the judgment on her cross-complaint, we will not discuss those causes of action here.

#### a. Causes of Action Against Realty Executives and Schmidt

The court began by noting ADP alleged a partly oral, partly written agreement to share commission. It found there was no "meeting of the minds" with respect to the alleged oral portion of the agreement and ADP had not proved its version of the events by a preponderance of the evidence. It concluded the early encounters between Kerry, Mark, and Schmidt never amounted to an express agreement, and Mark's and Kerry's roles as brokers versus buyers were not made clear.

16

Moreover, the court held ADP had failed to prove the existence of a written agreement to share commission: "There was a remarkable failure of Mark and Kerry, on behalf of ADP, to reduce any such 'agreement' to writing, notwithstanding numerous opportunities to do so." The court was "not convinc[ed]" by Mark's and Kerry's testimony that they did not reduce the agreement to writing because they thought they were protected by the purchase agreement. The court held nothing in the purchase agreement "protects" the buyers' broker. The court construed paragraph 7.1(k) to mean that *if* the listing and cooperating brokers executed a written commission-sharing agreement and provided it to Valleywide, payment of the commission had to be made as stated in the agreement. The brokers were third party beneficiaries of the purchase agreement only to the extent that paragraph 7.1(k) protected them from modification of any written commission agreement without their consent. But no written commission-sharing agreement existed between ADP and Realty Executives.

The court found "utterly unconvincing" ADP's evidence that a 50-50 commission split between brokers was custom and practice in the area. Further, the relevant ethical rules, while not binding on the parties, strongly suggested the brokers should discuss any commission-sharing agreement at the earliest opportunity and reduce it to writing.

Accordingly, the court found Realty Executives and Schmidt did not breach any contract with ADP because none existed, and since the causes of action for negligent and intentional interference with contract rose or fell on the existence of commission-sharing agreement, those causes of action failed as well. In addition, the common counts (quantum meruit and money had and received) failed "because California law provides that there is no right for a buyer's broker to recover a portion of a seller's broker's commission in the absence of an express agreement."

b. *Causes of Action Against Valleywide*

The court held Valleywide was not liable for failing to follow the instruction from ADP to withhold the disputed commission. It determined paragraph 7.1(k) was an agreement between the parties only and not an instruction to Valleywide. It rejected the testimony of ADP's expert, Wallace, that paragraph 7.1(k) gave ADP the right to give

17

instructions to Valleywide regarding the payment of commission. Valleywide was not obligated to investigate or decide whether a commission-sharing agreement between the brokers existed. Its only obligation was to follow the instructions of the seller and buyers, and the only instruction Valleywide received from one of them was the seller's irrevocable instruction to pay 7.5 percent of the purchase price to Realty Executives. There were no other conflicting instructions from the other parties to the purchase agreement.

The court entered judgment for Realty Executives, Schmidt, and Valleywide on the complaint and for ADP on Schmidt's cross-complaint.

## DISCUSSION

### 1. *Causes of Action Based on a Commission-sharing Agreement Between the Brokers*

ADP argues the court "overlooked" the evidence Schmidt knew ADP expected to be paid half the commission and failed to tell it she would not share the commission. It contends her silence was consent to commission sharing. We disagree. The court found there was no commission-sharing agreement, whether oral or written, and there was no meeting of the minds on this subject. This was not error. Substantial evidence supported this conclusion.

Mutual consent, or agreement by the parties on the same thing in the same sense, is required to form a contract. (Civ. Code, § 1565; *Bustamante v. Intuit, Inc.* (2006) 141 Cal.App.4th 199, 208.) The failure to reach a meeting of the minds on all material points of an agreement prevents the formation of a contract. (*Bustamante*, at p. 215.) When the formation of a contract is at issue and the evidence conflicts, the trier of fact must determine whether the contract actually existed. (*Id.* at p. 208.) We review the court's findings on disputed factual issues for substantial evidence, viewing the evidence in the light most favorable to the judgment, giving the benefit of every reasonable inference to the prevailing party, and resolving all conflicts in the prevailing party's favor. (*SFPP. v. Burlington Northern & Santa Fe Ry. Co.* (2004) 121 Cal.App.4th 452, 462.)

While the parties' evidence conflicted, Realty Executive and Schmidt's evidence was sufficient to support the determination that the brokers never formed a commission-

18

sharing agreement. According to Pagliassotti, it was common to share commissions, but there was no custom and practice in the industry to split commissions 50-50, and the obligation of the seller's broker to cooperate did not include the obligation to share a commission under relevant ethical rules. Pagliassotti had done several vacant land transactions in which the seller's broker did not share the commission at all, and the buyer compensated Pagliassotti for his broker services. A cooperating broker could not assume an offer to share a commission under relevant ethical rules.

According to Schmidt, Kerry and Mark did not tell her they expected to share in the commission before July 2006, and she never offered or agreed to a 50-50 split. When Kerry asked about the commission at their March 14 meeting, he did not ask how much she was offering to the cooperating broker. He merely asked about the amount of the commission ("2, 2-½ percent[?]"). She was taken aback by Kerry's question and did not know how to respond because it was an unusual question for a buyer, and she did not want to reveal how much Campbell was paying her. She did not answer the question and instead said that she had been working on the deal awhile and wanted to recoup her expenses. That was all they said about commission, and Schmidt moved on in her presentation.

She did not make an offer to share the commission at this point because she did not even realize Kerry and Mark were brokers until months later. She thought Kerry and Mark were merely buyers of the property because that was how they had represented themselves, both in written communications and orally. They never stated they were licensed real estate brokers. When she learned from Moller in July 2006 that they were brokers, she offered to share the commission with Kerry/ADP, but only up to 2.5 percent of the purchase price. Kerry rejected the offer. Thus, there was never any meeting of the minds on splitting the commission and no contract formed. ADP never accepted the only offer Realty Executives made.

The purchase agreement does not assist ADP in establishing a commission-sharing agreement. It refers to a potential separate agreement to share commission between the

19

brokers and makes the brokers third party beneficiaries. But the purchase agreement does not itself set forth the terms of any commission-sharing agreement.

Without a contract, Realty Executives was not liable for breach of contract. The existence of a valid contract is also an essential element of tortious interference with contract. (*Pacific Gas & Electric Co. v. Bear Stearns & Co.* (1990) 50 Cal.3d 1118, 1126.) Accordingly, Schmidt was not liable for intentional or negligent interference with contract either. The court did not err in entering judgment for Realty Executives and Schmidt on these causes of action.

## 2. *Cause of Action for Quantum Meruit*

The court held ADP did not prove its cause of action for quantum meruit "because California law provides there is no right for a buyer's broker to recover a portion of a seller's broker's commission in the absence of an express agreement." ADP contends the court misstated the law because quantum meruit does not require an express agreement, and there is no authority barring brokers from recovering from one another in quantum meruit. Assuming for the sake of argument the court erred in its statement of the law, we decline to reverse. ADP has not demonstrated a reasonable probability it would have prevailed on the quantum meruit claim. Any error, therefore, was not prejudicial.

"Quantum meruit refers to the well-established principle that 'the law implies a promise to pay for services performed under circumstances disclosing that they were not gratuitously rendered.' [Citation.] To recover in quantum meruit, a party need not prove the existence of a contract [citations], but it must show the circumstances were such that 'the services were rendered under some understanding or expectation of both parties that compensation therefor was to be made.'" (*Huskinson & Brown v. Wolf* (2004) 32 Cal.4th 453, 458.) The plaintiff bears the burden of showing he or she rendered services "at the request of the person to be charged" (*Miller v. Campbell, Warburton, Fitzsimmons, Smith, Mendel & Pastore* (2008) 162 Cal.App.4th 1331, 1344 (*Miller*); *Earhart v. William Low Co.* (1979) 25 Cal.3d 503, 515), and the services "were *intended to and did benefit* the defendant" (*Day v. Alta Bates Medical Center* (2002) 98 Cal.App.4th 243, 248). The defendant can defeat the cause of action by proving the plaintiff rendered the

services "gratuitously or without obligation" to pay on the defendant's part. (*Miller, supra*, at p. 1344.)

We do not reverse a judgment for "any error, ruling, instruction, or defect" unless the record demonstrates the error was "prejudicial" and a "different result would have been probable" absent the error. (Code Civ. Proc., § 475.) We do not presume an error is prejudicial. (*Ibid.*) The appellant must demonstrate it is reasonably probable the court would have reached a more favorable result in the absence of the error. (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800.)

Here, it is not reasonably probable the court would have permitted ADP to recover in quantum meruit, had the court not committed the purported legal error. To recover in quantum meruit from Realty Executives and Schmidt, ADP had to show it rendered its broker services at their request, and moreover, that its services were intended to benefit them. But it is undisputed Bradley Business Center engaged ADP to act as its broker— that is, ADP was performing broker services at *its client's* request and for *its client's* benefit, not at Realty Executives and Schmidt's request. Indeed, as the agent of its client, ADP owed its client a fiduciary duty of "undivided service and loyalty" and a duty to perform diligently, among other duties. (*Field v. Century 21 Klowden-Forness Realty* (1998) 63 Cal.App.4th 18, 25; see *Whitney Inv. Co. v. Westview Dev. Co.* (1969) 273 Cal.App.2d 594, 601.) While Kerry said he communicated with Schmidt about the work he was doing to close the deal and she "encouraged" his work, there is no indication she requested any of it. They were not in a principal-agent relationship such that one might expect her to request services of him.

Additionally, although recovery in quantum meruit does not require proof of an express agreement, the doctrine does require that the plaintiff render its services under some "understanding or expectation" on the part of *both parties* that compensation would be forthcoming. Schmidt did not know Kerry and Mark were brokers until late July 2006. She thought they were buyers, and thus there was no understanding on her part that Kerry was rendering broker services with an expectation of compensation from her.

21

By the time she did expect to compensate them (an offer Kerry rejected), the deal was nearly done.

Further, there was substantial evidence Realty Executives had no obligation to compensate ADP. (*Miller, supra*, 162 Cal.App.4th at p. 1344.) According to Pagliassotti, the NAR Code of Ethics and Standards of Practice is the "bible" for real estate brokers. NAR is the primary national trade association for real estate professionals. NAR members agree to be bound by its code. (1 Baxter et al., Cal. Real Estate Brokers: Law and Litigation (Cont.Ed.Bar 2013) Overview of Real Estate Brokerage, § 1.6, pp. 1-6 to 1-7.) The NAR code applies equally to members of the California Association of Realtors (CAR), which is a member association of NAR. (*Id.* at p. 1-6.) Schmidt was a member of both NAR and CAR in 2006. Pagliassotti opined any licensed real estate broker would be aware of the NAR code. The NAR code requires brokers to cooperate with each other, but that obligation to cooperate "does not include the obligation to share commissions, fees, or to otherwise compensate another broker." The SIOR, a professional organization for commercial (industrial and office) realtors, also promulgates an ethical code. Its code states the obligation to cooperate with other brokers "is not an obligation to share commissions or fees or to otherwise compensate other real estate professionals." Though these ethical codes are not binding law, courts have looked to them when circumscribing brokers' duties. (E.g., *Nguyen v. Scott* (1988) 206 Cal.App.3d 725, 736; *Easton v. Strassburger* (1984) 152 Cal.App.3d 90, 101.)

The court's findings in the statement of decision demonstrate it accepted Realty Executives and Schmidt's evidence and rejected ADP's version of the events. Moreover, it found ADP's evidence of a custom and practice to share commissions 50-50 "utterly unconvincing." In light of the substantial evidence that the circumstances supporting quantum meruit did *not* exist here, and the court's findings against ADP in the statement of decision, we cannot say it is probable the court would have reached a more favorable result, absent the asserted error.

22

### *3. Causes of Action Involving Valleywide's Duties*

ADP alleged breach of contract, breach of fiduciary duty, and negligence against Valleywide because it (1) did not wait for an executed "separate agreement" on commission between brokers, as referenced in paragraph 7.1(k), (2) refused to hold the commission pending resolution of the commission dispute, as instructed by the buyers and ADP, and (3) instead distributed all the disputed commission funds to Realty Executives. ADP argues the court erred in finding Valleywide did not receive conflicting instructions on commission and Valleywide did not have a duty to hold the disputed commission. We need not address whether the court erred in these findings. Regardless of whether Valleywide's disbursal of the commission funds breached any contract or tort duties, Valleywide is not liable due to a lack of causation.

"An escrow holder who fails to comply with instructions may be liable to the injured party on a theory of breach of contract, negligence or breach of fiduciary duty." (3 Miller & Starr, Cal. Real Estate (3d ed. 2010) Escrows, § 6:17, pp. 6-68 to 6-69, fns. omitted.) Causation of damages is an essential element of all three causes of action. (*Gutierrez v. Girardi* (2011) 194 Cal.App.4th 925, 932; *Troyk v. Farmers Group, Inc.* (2009) 171 Cal.App.4th 1305, 1352; *Vasquez v. Residential Investments, Inc.* (2004) 118 Cal.App.4th 269, 278, 279.) Causation of damages in contract as well as tort cases "'requires that the damages be proximately caused by the defendant's breach, and that their causal occurrence be at least reasonably certain.' [Citation.] A proximate cause of loss or damage is something that is a substantial factor in bringing about that loss or damage." (*US Ecology, Inc. v. State of California* (2005) 129 Cal.App.4th 887, 909.) "Substantial factor" has no precise definition, but it is something more than a theoretical factor in producing the injury. (*Ibid.*) "Conduct is not a substantial factor in causing harm if the same harm would have occurred without that conduct." (CACI No. 430, brackets omitted; see *Viner v. Sweet* (2003) 30 Cal.4th 1232, 1240.)

Valleywide argues if ADP failed to show it is entitled to any of the commission funds, Valleywide's actions could not have been the proximate cause of any damage to ADP. We agree. ADP alleges damages against Valleywide in an amount equal to half

the commission, plus the attorney fees and costs ADP has incurred to collect from Realty Executives and Schmidt. In other words, ADP's alleged damages are predicated on the theory that it was entitled to half the commission under an express agreement or a quantum meruit theory. But we hold otherwise in the foregoing parts. ADP was not entitled to a portion of the commission funds, and ADP would not now be entitled to the commission funds, even had Valleywide held them and not disbursed them. What is more, assuming Valleywide had held the funds, ADP still would have incurred attorney fees and costs to resolve the dispute with Realty Executives and Schmidt. Accordingly, any failure to act according to ADP's instructions was not a substantial factor in causing ADP's loss. The same loss would be occurring even without Valleywide's failure to hold the funds.

ADP asserts we should reverse and remand regardless of whether Valleywide's actions caused actual damages because ADP is entitled, at a minimum, to nominal damages for breach of contract. Assuming for the sake of argument Valleywide's conduct constituted a breach of contract, we need not reverse for an award of nominal damages. A plaintiff may recover nominal damages for breach of contract, despite that actual damage was not inflicted, because the defendant's failure to perform a contractual duty is a legal wrong fully distinct from actual damages. (Civ. Code, § 3360; *Sweet v. Johnson* (1959) 169 Cal.App.2d 630, 632.) The amount of nominal damages must be trivial, no more than a few cents or a dollar. (*Avina v. Spurlock* (1972) 28 Cal.App.3d 1086, 1089.) Generally, when a plaintiff is entitled at most to nominal damages, the failure to award nominal damages is not ground for reversal. (*Sweet v. Johnson, supra*, at p. 633.)

ADP relies on two exceptions. When the award of nominal damages carries costs as a matter of right, or when the cause of action seeks to establish a permanent property right, the failure to award nominal damages may be grounds for reversal. (*Sweet v. Johnson, supra*, 169 Cal.App.2d at pp. 633-634.) Neither of these exceptions apply. ADP does not identify the permanent property right at issue, but assuming it is the asserted right to a commission, we have determined ADP did not prove any such right.

24

As to costs, ADP would not be entitled to costs as a matter of right if awarded nominal damages. A "'[p]revailing party,'" which includes the party with a net monetary recovery, is entitled to recover costs as a matter of right in any action "[e]xcept as otherwise expressly provided by statute." (Code Civ. Proc., § 1032, subds. (a)(4), (b), italics added.) One statutory exception to a prevailing party's right to recover costs is set forth in Code of Civil Procedure section 1033. That section allows a trial court in its discretion to deny costs when a prevailing plaintiff recovers a judgment in an unlimited civil case within the $25,000 jurisdictional limit for a limited civil case, such as a judgment for nominal damages for breach of contract. (Code Civ. Proc., § 1033, subd. (a); *Carter v. Cohen* (2010) 188 Cal.App.4th 1038, 1052.) Because a judgment for nominal damages would not have carried costs as a matter of right, the general rule applies, and any failure to award nominal damages does not warrant reversal. (*Sweet v. Johnson, supra*, at p. 634.)

### 4. Attorney Fees and Costs

After judgment, the parties filed memoranda of costs, and Realty Executives and Schmidt filed a motion for attorney fees. The court awarded (1) Realty Executives and Schmidt, jointly and severally, costs in the amount of $14,911.68; (2) Realty Executives and Schmidt, jointly and severally, attorney fees in the amount of $520,182.25; and (3) Valleywide costs in the amount of $8,469.75. It also granted Schmidt's motion to strike the costs of ADP because Schmidt was the prevailing party as between the two.

ADP asserts several errors with respect to the costs and fee orders. We review a trial court's award of fees and costs for abuse of discretion. (*Connerly v. State Personnel Bd.* (2006) 37 Cal.4th 1169, 1175; *Seever v. Copley Press, Inc.* (2006) 141 Cal.App.4th 1550, 1556.)

### a. Due Process

ADP contends the fee award to Schmidt violated its due process rights because it did not have adequate notice of the grounds for the award. ADP asserts Schmidt's opening brief sought fees only under Code of Civil Procedure section 1021, yet in the

25

reply brief she also sought fees under Civil Code section 1717.  The court's award cited only section 1717.

ADP does not accurately characterize Realty Executives and Schmidt's joint motion.  Their notice of motion cited both statutes as a basis for their motion.  Their memorandum of points of authorities cites both statutes as a basis for the fee award to both defendants.  (E.g., "The law is clear that since they are the prevailing parties, Defendants are entitled to enforce the attorneys' fees provision in Paragraph 14 of the Purchase Agreement, pursuant to Civil Code § 1717 and Code of Civil Procedure § 1021.")  ADP had adequate notice of the grounds for Schmidt's motion and an opportunity to respond in its opposition brief and at the hearing.  We find no violation of ADP's due process rights.

b. *Fees Sought in Cross-complaint*

In her cross-complaint against ADP, Schmidt sought *as damages* the attorney fees she incurred for defending and indemnifying Realty Executives in this litigation.  She did not recover these damages because she failed to prove the causes of action in the cross-complaint.  After trial, she successfully sought her own attorney fees *as allowable costs* on the ground that she was the prevailing party.  ADP contends the court erred in awarding fees to Schmidt as the prevailing party because she did not prove them as an element of damages on her cross-complaint.   But she was not required to do so to recover them as costs, and ADP cites no authority for this proposition.  "When an issue is unsupported by pertinent or cognizable legal argument it may be deemed abandoned . . . ."  (*Landry v. Berryessa Union School Dist.* (1995) 39 Cal.App.4th 691, 699.)  We decline to reverse the fee order on this ground.

c. *Prevailing Party Status*

ADP contends the court abused its discretion in finding Schmidt was the prevailing party for purposes of the attorney fees award because she did not prevail on her cross-complaint.  We disagree.

The trial court's order recognized Schmidt's right to fees was complicated by the fact that she had prevailed on the complaint but not on her cross-complaint.  The court

noted that when there are cross-actions and the court awards no relief in either action, it is not obligated to find there is no prevailing party. (*Hsu v. Abbara* (1995) 9 Cal.4th 863, 875, fn. 10.) Rather, "[i]f the court concludes that the defendant's cross-action against the plaintiff was essentially defensive in nature, it may properly find the defendant to be the party prevailing on the contract." (*Ibid.*) The court went on to thoroughly analyze whether Schmidt's cross-complaint was essentially defensive in nature and concluded it was.

ADP's argument does not address the court's conclusion that the cross-complaint was essentially defensive in nature. Instead, it argues Schmidt did not fit the contractual definition of prevailing party under the purchase agreement. ADP asserts only a "clear winner"—one who prevails on all its claims and defenses—qualifies as a prevailing party.

The attorney fee provision in the purchase agreement states:

"If any Party or Broker brings an action or proceeding involving the Property whether founded in tort, contract or equity, or to declare rights hereunder, the Prevailing Party (as hereafter defined) in any such proceeding, action, or appeal thereon, shall be entitled to reasonable attorneys' fees. . . . *The term, 'Prevailing Party' shall include, without limitation, a Party or Broker who substantially obtains or defeats the relief sought, as the case may be*, whether by compromise, settlement, judgment, or the abandonment by the other Party or Broker of its claim or defense." (Italics added.)

ADP maintains Schmidt would be the prevailing party under this provision only if she *both* obtained the relief sought in her cross-complaint *and* defeated the relief sought in the complaint. We do not agree with this interpretation. The language is clear that a prevailing party can be one who either substantially obtains *or* defeats the relief sought. Moreover, even if we were to interpret the language as ADP suggests, the definition of prevailing party would merely "include, without limitation," ADP's definition, and it thus could include other definitions. The court did not, therefore, abuse its discretion by looking to case law to help it determine the prevailing party.

27

*d. Realty Executives' Fees*

ADP next contends the court erred in awarding Realty Executives its fees because Schmidt provided its defense and it did not actually incur fees. We also reject this contention.

California courts have repeatedly affirmed awards of attorney fees that were not "actually incurred." (*Nemecek & Cole v. Horn* (2012) 208 Cal.App.4th 641, 651-652.) For instance, in *PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1094-1095, our Supreme Court held attorney fees may be recovered under Civil Code section 1717 for the work of in-house counsel. The trial court was not required to use a "cost-plus approach"—a calculation of the actual salary, costs, and overhead of in-house counsel— but could instead use market value to determine reasonable attorney fees. (*Id.* at pp. 1096-1097.) In *Lolley v. Campbell* (2002) 28 Cal.4th 367, 371, our Supreme Court rejected the contention that the trial court could not award attorney fees to an indigent employee who did not incur fees because he was represented by the Labor Commissioner. And in *International Billing Services, Inc. v. Emigh* (2000) 84 Cal.App.4th 1175, 1179, 1193, the court held the prevailing parties were entitled to an attorney fees award even though a third party (their employer) had paid their fees during litigation. The nonprevailing parties could not avoid their obligation to pay attorney fees based on the "'fortuitous circumstance'" that the prevailing parties had "discovered how to defend the lawsuit without having to pay out of their pockets." (*Id.* at p. 1193; see also *Staples v. Hoefke* (1987) 189 Cal.App.3d 1397, 1410 ["Plaintiffs were not entitled to avoid their contractual obligation to pay reasonable attorney fees based on the fortuitous circumstance that they sued a defendant who obtained insurance coverage providing a defense."].)

Consistent with these authorities, we hold the court did not err in awarding fees to Realty Executives.

28

*e. Denial of Costs to ADP*

ADP asserts the court erred in denying ADP its costs against Schmidt on her cross-complaint because it fell within the statutory definition of "prevailing party" for costs purposes. We disagree.

A prevailing party is entitled as a matter of right to recover costs under Code of Civil Procedure section 1032. (§ 1032, subd. (b).) "'Prevailing party' includes [(1)] the party with a net monetary recovery, [(2)] a defendant in whose favor a dismissal is entered, [(3)] a defendant where neither plaintiff nor defendant obtains any relief, and [(4)] a defendant as against those plaintiffs who do not recover any relief against that defendant." (*Id.*, subd. (a)(4).) Category three applies to the situation here—when a plaintiff files suit and then a defendant files a cross-complaint. This is the only category that refers to a defendant's attempt to obtain relief, which a defendant cannot do in an answer. The defendant must file a cross-complaint to affirmatively seek relief. (*McLarand, Vasquez & Partners, Inc. v. Downey Savings & Loan Assn.* (1991) 231 Cal.App.3d 1450, 1454.)

Under Code of Civil Procedure section 1032, when a plaintiff is denied relief on the complaint and the defendant is denied relief on the cross-complaint, the defendant is the prevailing party entitled to costs. (*Cussler v. Crusader Entertainment, LCC* (2012) 212 Cal.App.4th 356, 371; *McLarand, Vasquez & Partners, Inc. v. Downey Savings & Loan Assn., supra*, 231 Cal.App.3d at p. 1454.) ADP was not the defendant/cross-complainant in this situation and thus was not the prevailing party.

*f. Valleywide's Costs*

ADP lastly contends the court erred in granting Valleywide its costs because its memorandum of costs was untimely. We disagree.

The court entered the judgment on October 26, 2012. On the same date, the court clerk mailed the parties a minute order entitled "Statement of Decision After Court Trial/Notice of Entry of Judgment and Judgment." (Capitalization omitted.) On October 31, 2012, counsel for Schmidt and Realty Executives served notice of entry of

judgment on all the parties. Valleywide served its memorandum of costs on November 15, 2012.

Under California Rules of Court, rule 3.1700(a)(1),[4] a party must serve its cost memorandum "within 15 days after the date of mailing of the notice of entry of judgment or dismissal by the clerk under Code of Civil Procedure section 664.5 or the date of service of written notice of entry of judgment or dismissal, or within 180 days after entry of judgment, whichever is first."

Here, the 15-day period for filing the memorandum of costs started running on October 31, 2012, when Schmidt and Realty Executives served notice of entry of judgment. This is because the clerk's mailing on October 26 was not sufficient to constitute "notice of entry of judgment . . . by the clerk under Code of Civil Procedure section 664.5." (Rule 3.1700(a)(1).) Under section 664.5, the clerk of court is required to mail notice of entry of judgment in only two cases—when the prevailing party is not represented by counsel or "[u]pon order of the court." (Code Civ. Proc., § 664.5, subds. (b), (d).) Otherwise, it is the duty of the party submitting the proposed judgment to serve notice of entry of judgment on all parties. (*Id.*, subd. (a); *Van Beurden Ins. Services, Inc. v. Customized Worldwide Weather Ins. Agency, Inc.* (1997) 15 Cal.4th 51, 63.) Unless the prevailing party is in propria persona, for a clerk's mailing to qualify as a notice of entry of judgment under section 664.5, the "notice must affirmatively state that it was given 'upon order by the court' or 'under section 664.5.'" (*Van Beurden Ins. Services, Inc.*, at p. 64.) The clerk's mailing in this case did not state either of those things.

Accordingly, the clerk's mailing did not qualify as a clerk's notice of entry of judgment under Code of Civil Procedure section 664.5 and rule 3.1700, and it therefore did not trigger the period for filing memoranda of costs. Schmidt and Realty Executives served the notice of entry of judgment to trigger the period on October 31. Valleywide's memorandum of costs was timely from this date.

---

[4] Further rule references are to the California Rules of Court.

## DISPOSITION

The judgment and orders are affirmed.  Realty Executives, Schmidt, and Valleywide shall recover costs on appeal.

FLIER, J.

WE CONCUR:

BIGELOW, P. J.

RUBIN, J.